Clayeo C. Arnold, SBN 65070
Gary B. Callahan, SBN 47543
Gina M. Bowden, SBN 252815
Clayeo C. Arnold, A Professional Law Corporation
865 Howe Avenue
Sacramento, CA 95825
Telephone: (916) 924-3100
Facsimile: (916) 924-1829
Email: gcallahan@justice4you.com

**FILED**

April 7, 2017

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

**SEALED**

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

United States of America and State of
California, ex rel. Gant Van Der Boom,
Darleen Roland, and Jena Burns,

            Plaintiffs and Relators,

      vs.

Precision Medical Products (PMP),
Incorporated, A California Corporation,
Jeremy Perkins, Mark Reynolds,

            Defendants.

Case No.: 2:15-cv-0428 MCE KJN

Second Amended Complaint for Money
Damages and Civil Penalties for Violations
of the False Claims Act and Demand for
Jury Trial

[Filed Under Seal Pursuant To 31 U.S.C. §
3730(b)(2)  and Cal. Gov. Code  § 12652]

SECOND AMENDED COMPLAINT FOR MONEY DAMAGES AND CIVIL PENALTIES FOR VIOLATIONS
OF THE FALSE CLAIMS ACT AND DEMAND FOR JURY TRIAL - 1

# **Table of Contents**

INTRODUCTION...................................................................................................................2

JURISDICTION AND VENUE...........................................................................................4

PARTIES ..............................................................................................................................4

BACKGROUND...................................................................................................................6

DEFENDANTS' FRADULENT SCHEME ......................................................................13

FIRST CAUSE OF ACTION.............................................................................................36

SECOND CAUSE OF ACTION........................................................................................36

THIRD CAUSE OF ACTION............................................................................................37

FOURTH CAUSE OF ACTION........................................................................................38

FIFTH CAUSE OF ACTION ............................................................................................38

SIXTH CAUSE OF ACTION............................................................................................41

SEVENTH CAUSE OF ACTION......................................................................................41

JURY DEMAND.................................................................................................................42

PRAYER FOR RELIEF .....................................................................................................42

# **INTRODUCTION**

1.      In this action, relators seek to recover damages and civil penalties on behalf of the United States and the State of California for false and/or fraudulent statements, records, and claims made or caused to be made by defendants Precision Medical Products Inc. (PMP), Jeremy Perkins, and Marc Reynolds (collectively "defendants") as well as their affiliates, departments, subsidiaries, agents, employees, contractors, joint venturers, partners, and co-conspirators, in violation of the federal False Claims Act (FCA), 31 U.S.C. §§ 3729 et seq. .; the California False Claims Act (CFCA) under Cal. Gov. Code § 12650, et seq.; and the federal Anti-Kickback Statute (AKS), 42 U.S.C. § 1320a-7b(b).

2.      Since on or about January 1, 2011 defendants have been supplying Durable Medical Equipment (hereafter "DME") to patients covered by government funded health programs that include, but are not limited to, Medicare, MediCal, and Tricare.

3.     As part of their operation, defendants have been knowingly submitting and/or causing the submission of false claims, and knowingly using and/or making false records that are material to false or fraudulent claims paid by government funded health programs that include, but are not limited to, Medicare, MediCal, and Tricare.

4.     Defendants' fraudulent schemes involve submitting: 1) claims tainted by illegal commissions paid to PMP's 1099 independent contractor sales representatives in violation of the Anti-Kickback Statute (AKS); 2) claims for DME devices supported by copied, stamped, and/or digitally forged physician signatures in violation of Medicare requirements; 3) claims for free and no cost items in violation of Medicare requirements; 4) claims that routinely waived patient co-insurance in violation of Medicare requirements; and 3) claims for DME devices not provided and/or not medically necessary.

5.     Defendants knowingly submitted the above cited fraudulent claims in so far as they had actual knowledge, acted in deliberate ignorance, and/or acted in reckless disregard of the truth or falsity of the information.

6.     The false records, statements, representations, and/or omissions were material to obtaining payment, and the government would not have paid the claims had it known of defendants' fraudulent representations, records, statements, and/or omissions.

7.     As a result of their fraudulent conduct, defendants received millions of dollars from government funded health programs that include, but are not limited to, Medicare, MediCal, and Tricare.  This conduct caused the United States and the state of California to sustain a direct loss of funds and damage to their interests.

8.     Relators do not know whether defendants' misconduct ceased after learning of relators' allegations as a result of the federal investigation that followed the filing of the complaint. Relators intend that this Second Amended Complaint address and remedy any of defendants' misconduct that continues after the filing of the complaint and the instant second amended complaint.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. §§ 3730(b), which confer jurisdiction of this Court over actions brought by private citizen plaintiffs under the federal False Claims Act (FCA).

10.     This Court has personal jurisdiction over defendants pursuant to 31 U.S.C. § 3732(a), because defendants reside within and/or are doing and/or previously did business within the Eastern District of California.

11.     This Court has jurisdiction over the California False Claims Act (CFCA) causes of action under 31 U.S.C. § 3732(b), which confers jurisdiction of this Court for pendant claims brought under state false claims acts. This Court also has jurisdiction and venue over relator Van der Boom's pendent state claims for constructive discharge and retaliation under the California Labor Code because such claims arise out of the same facts.

12.     Venue in the Eastern District of California is proper pursuant to 28 U.S.C. 1391(b) and 31 U.S.C. § 3732, because the defendants transact or transacted business in the Eastern District of California, and a substantial part of the events giving rise to the instant action occurred in the Eastern District of California.

## PARTIES

13.     The United States of America and the State of California are named plaintiffs on whose behalf relators bring this action based upon defendants' violations of the False Claims Act (FCA) under 31 U.S.C. §§ 3729, et seq., and the California False Claims Act (CFCA), Cal. Gov. Code § 12650, et seq.

14.     Relator Darleen Roland is a citizen of the United States of America and a resident of Tuolumne County in the State of California. Relator Roland is sole proprietor of Efficiency Plus Medical Billing (EPMB), a medical billing company. On or about March 11, 2011, relator Roland entered into an agreement with defendant Perkins for EPMB to provide medical billing services to defendant Precision Medical Products (PMP). From approximately March 2011 through January 2014, EPMB performed billing services for PMP pursuant to their

contract. Throughout this period, relator Roland was personally involved with and handled PMP's account.

15.     Relator Jena Burns is a citizen of the United States of America and a resident of Tuolumne County in the State of California. Relator Burns works as a manager in EPMB's Durable Medical Equipment (DME) billing department.

16.     Relator Gant Van der Boom is a citizen of the United States of America and a resident of Placer County in the State of California. From on or about June 2010 through October 1, 2014, relator Van der Boom worked at PMP as a sales representative.

17.     Defendant Precision Medical Products (hereinafter, "PMP") is a private corporation incorporated in the State of California (entity no. C3282858) on March 5, 2010. PMP's current registered address is 2217 Plaza Dr., Rocklin, CA 95765 and its agent for service of process is defendant Perkins.

18.     Defendant PMP is owned and operated by defendant Jeremy Perkins, who is the founder, director, manager, and owner of PMP.

19.     Defendant Marc Reynolds has been employed at PMP since on or about 2010 and has served as the Chief Executive Officer of PMP since 2013.

20.     Defendant Perkins started PMP in Auburn, CA in 2010. Since on or about January 1, 2011, PMP defendants have been supplying DME to patients covered by government funded health programs that include, but are not limited to, Medicare and Tricare. PMP obtained billing privileges and became a Medicare provider on or about September 2011. Since then, PMP has grown nationwide with numerous offices, employees, contractors, and/or agents throughout California and the United States. In 2015, PMP was named the "fastest growing company" by the Sacramento Business Journal, citing 332.72% growth from 2012-2014. See Sacramento Business Journal, Fastest-Growing Companies, available at:

http://www.bizjournals.com/sacramento/subscriber-only/2015/07/03/fastest-growing-companies.html.

///

# BACKGROUND

21.     Relators sue in the name of the United States under the federal False Claims Act (FCA), 31 U.S.C. §§ 3729 et seq., and in the name of the State of California under the California False Claims Act (CFCA), Cal. Gov. Code § 12650, et seq.  The FCA was originally enacted during the Civil War and substantially amended in1986 to enhance the relator-government cooperation in combatting fraud and the ability of the United States government to recover losses due to fraud against it. Congress intended the amendments to create incentives for individuals with knowledge of fraud against the government to privately enforce the act without fear of retaliation and government inaction, and to encourage the private bar to commit legal resources to prosecuting fraud on the government's behalf.

**A.      The Federal False Claims Act**

22.     The FCA provides for the award of treble damages and civil penalties for, *inter alia*, knowingly presenting or causing to be presented false or fraudulent claims for payment, and for knowingly making or using false records or statements material to false or fraudulent claims paid by the government.  31 U.S.C. §§ 3729(a)(1)(A), (B); Cal. Gov. Code § 12651.

23.     The FCA provides, in pertinent part, that a person who:
> (a)(1)(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; or
> (a)(1)(B) knowingly makes, uses, or causes to be made used, a false record or statement material to a false or fraudulent claim;…is liable to the United States Government for a civil penalty of not less than $5,500 and not more than $11,000, as adjudicated by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note, Public Law 104-410), plus 3 times amount of damages which the Government sustains …

31 U.S.C. § 3729.

24.     Under the FCA:
> (1) the terms "knowing" and "knowingly"-
> (A) mean that a person, with respect to information –
> (i) has actual knowledge of the information;
> (ii) acts in deliberate ignorance of the truth or falsity of the information; or
> (iii) acts in reckless disregard of the truth or falsity of the information, and
> (B) require no proof of specific intent to defraud[.]

31 U.S.C. § 3729(b)(1).

25.     The term "material" means "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). The standard of proof under the FCA is preponderance of the evidence.  31 U.S.C. § 3731(d); Cal. Gov. Code § 12650(b)(4).

**B.     The Anti-Kickback Statute**

26.     The Anti-Kickback Statute (AKS), 14 U.S.C. § 1320a-7b(b), arose out of Congress' concern that remuneration given to those who can influence healthcare decisions would result in goods and services being provided that are medically unnecessary, of poor quality, or even harmful to a vulnerable population. To protect the integrity of the Medicare program from these harms, Congress enacted a prohibition against payment of kickbacks in any form, regardless of whether a particular kickback gives rise to overutilization or results in poor quality care. First enacted in 1972, Congress strengthened the AKS in 1977 and 1987 to ensure that kickbacks masquerading as legitimate transactions do not evade its reach. *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b), (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient Program Protection Act of 1987, Pub. L. No. 100-93.

27.     Accordingly, the AKS prohibits any person or entity from "knowingly and willfully offer[ing] or pay[ing] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person…to purchase…or arrange for recommending purchasing… [a]ny good, facility, or item for which payment may be made in whole or in part under a Federal health care program."  14 U.S.C. § 1320a-7b(b)(2).

28.     Payments where one purpose of the remuneration is to induce or reward referrals, which may be paid in whole or in part out of Medicare funds, is an example of such illegal remuneration. *United States v. Kats*, 871 F.2d 105, 108 & fn.1 (9th Cir. 1989) (citing agreement with *United States v. Gerber*, 760 F.2d 68, 72 (3rd Cir. 1985)).

29.     Under the AKS "[a]ctual knowledge or specific intent is not required[.]  With respect to violations of this section, a person need not have actual knowledge of this section or specific intent to commit a violation of this section."  42 U.S.C. § 1320a-7b(h).

30.     As clarified by the Patient Protection and Affordable Care Act of 2010 ("PPACA"), Pub. L. No. 111-18, § 6402(f), 124 Stat. 119, codified at 42 U.S.C. § 1320a-7b(g), "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the FCA]."  According to the legislative history of the PPACA, this amendment to the AKS was intended to clarify "that all claims resulting from illegal kickbacks are considered false claims for the purpose of civil actions under the False Claims Act[.]" 155 Cong. Rec. S10854.

**C.     The Medicare Program**

31.     In 1965, Congress enacted the Health Insurance for the Aged and Disabled Act, 42 U.S.C. § 1395, et seq. (known as Medicare or Medicare program).  Codified in Title XVIII of the Social Security Act, the Medicare program coverage is based on age, disability, or affliction with end-stage renal disease.  *See* 42 C.F.R. §§ 426, 426-1. The regulations implementing the Medicare program are found at 42 C.F.R. § 409, et seq.

32.     The Medicare program is comprised of Parts A, B, C, and D.  Of relevance here, Medicare Part B covers partial payment for among other things, Durable Medical Equipment (DME), Prosthetics, Orthotics, and Supplies (POS).  42 U.S.C § 1395m(a)(13).

33.     The Secretary of Health and Human Services (HHS) has the overall responsibility for the administration of Medicare. Within HHS, the responsibility for administration of Medicare has been delegated to Centers of Medicare and Medicaid Services (CMS).  To assist in the administration of Medicare Part B, CMS contracts with DME Medicare Administrative Contractors (DMACs), who generally act on behalf of CMS to process and pay Part B claims and perform administrative functions on a regional level. DME providers located in California submit their claims for Medicare Part B DME to Noridian for reimbursement.

34.     The United Sates reimburses Medicare providers with payments from the Medicare Trust Fund, through CMS, as supported by American taxpayers. Medicare spends

significant amounts on Durable Medical Equipment (DME).  In 2014, the federal government spent nearly $6 billion on payments for DME. *See* Centers for Medicare and Medicaid Services, CMS Statistics, available online at https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/CMS-Statistics-Reference-Booklet/Downloads/CMS_Stats_2014_final.pdf.

35.     Improper payments under Medicare represent a loss to the public fisc, and CMS has recognized that DME suppliers and providers represent an area of high risk of fraud and abusive practices. The Comprehensive Error Rare Testing (CERT) statistics indicate that for fiscal year 2015, Medicare improper payment rate for DME was 39.9%, which is nearly three times the improper payment rate for other services such as inpatient services (6.2%) or physician/lab/ambulance services (12.7%). Centers for Medicare and Medicaid Services, CERT, available at https://www.cms.gov/Research-Statistics-Data-and-Systems/Monitoring-Programs/Medicare-FFS-Compliance-Programs/CERT/index.html?redirect=/cert.

### 1) CMS Form 855S

36.     Because it is not feasible for the Medicare program, or its contractors, to review the patient files for the millions of claims for payment it receives from providers, the Medicare program relies upon the providers to know and comply with the Medicare requirements, and trusts providers to be truthful and accurate with their claims.

37.     To become a Medicare provider, a person or entity must enroll in the program. To do so, providers must enter into a participation agreement with Medicare using CMS Form 855S certifying their continued compliance with the Social Security Act and Medicare regulations. 42 C.F.R. § 424.516(a)(1). Suppliers also complete CMS Form 855S to change information, reactivate, revalidate, and/or terminate their Medicare enrollment.

38.     CMS Form 855S contains a certification Section 15 that must be signed under oath and under penalty of perjury by authorized officials that "legally and financially bind [the] supplier to the laws, regulations and program instructions of the Medicare Program." By signing Section 15 the supplier certifies, *inter alia*, that:

(1) I agree to abide by the Medicare laws, regulations and program instructions that apply to this supplier. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark Law), and on the supplier's compliance with all applicable conditions of participation in Medicare.

(2) I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and I will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

39.     Because Medicare is a trust-based program, the supplier or provider agrees to take on a duty to be knowledgeable of the statutes, regulations, and guidelines for coverage. 42 C.F.R. § 424.516(a)(1); CMS Form 855S.

40.     Defendants Perkins and Reynolds designated themselves as the authorized officials and signed the certification statement in Section 15 of CMS Form 855S binding PMP and certifying that they understood that PMP was legally and financially required to comply with the applicable Medicare laws, regulations, and program instructions – including the AKS.

        2)  *National Provider Number (NPI)*

41.     The National Provider Number (NPI) is a standard and unique health identifier for health care providers and is assigned by the National Plan and Provider Enumeration System. All providers and practitioners must have an assigned NPI number in order to bill Medicare, and a provider is required to use its NPI to identify itself on all standard transactions that it conducts where its health care provider identifier is required. 45 C.F.R. § 162.410(a).

42.     On September 30, 2011, defendant Perkins obtained an NPI number for PMP (no. 1629392592), which was used by PMP defendants to bill and obtain payment from government funded health plans, including Medicare, from on or about October 2011 through at least October 2014.

43.     Defendants also billed government funded health plans including Medicare prior to September 30, 2011. From on or about January 1, 2011 to October 2011, PMP billed

government funded insurers, including Medicare, through a New York based biller under an unknown NPI number.

### 3) *Reimbursement and CMS Form 1500*

44.    Medicare pays only for service or device that is "reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member."  42 U.S.C. § 1395y(a)(1)(A). Coverage for Durable Medical Equipment (DME) is dependent on either a national coverage or local coverage determination as to whether a particular item or service is covered under Medicare Part B. *See* 42 U.S.C. § 1395ff(1)-(2). CMS promulgates, issues, and publishes detailed coverage instructions available online via national coverage policies (NCDs), Medicare Carrier Manuals, Program Integrity Instruction Manuals, and Transmittals.  DMACs issue statements outlining the national coverage policy, and may specify additional coverage requirements though Local Coverage Determinations (LCDs), which are available online to providers and suppliers such as PMP.  CMS, Medicare Program Integrity Manual, Pub. No. 100-08, ch.13, §§ 13.1, 13.1.1, 13.1.3, 13.1.4; Noridian, Active LCDs, available online at:

https://med.noridianmedicare.com/web/jddme/policies/lcd/active.

45.    Reimbursement under the Medicare program to DME suppliers/providers is subject to a fee schedule that sets the maximum amount payable for covered items in each area of Medicare's jurisdiction.  Medicare pays 80% of the fee schedule amount, and the patient is responsible for any deductible and the remaining 20% as co-insurance.  Some patients have a secondary insurance policy that may cover all or some of the patient's co-insurance and/or deductible.

46.    To obtain reimbursement from Medicare, providers submit paper or electronic claims using CMS Form 1500. Among the information the provider includes on a CMS Form 1500 are Current Procedural Terminology ("CPT") / Healthcare Common Procedure Coding

System ("HCPCS")[1] codes.  The CPT/HCPCS codes identify the device and the services rendered to the patient, and the reimbursement sought.

47.  CMS Form 1500 certifies, *inter alia* that the information provided is "true, accurate, and complete," and that "any false claims, statements, or documents, or concealment of material fact, may be prosecuted under applicable Federal and State laws."

48.  A provider presenting a claim to Medicare, also certifies on the CMS Form 1500 that its services were "medically indicated and necessary for the health of the patient and were personally furnished by [the signer] or were furnished incident to my professional service by my employee under my immediate supervision, except as otherwise expressly permitted by Medicare … regulations." The 2012 CMS Form 1500 further certifies that "2) I have familiarized myself with all applicable laws, regulations, and program instructions, which are available from the Medicare contractor;…4) this claim, whether submitted by me or on my behalf by my designated billing company, complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment including but not limited to the Federal anti-kickback statute and Physician Self-Referral law (commonly known as Stark law)…"

49.  Generally, once a provider submits a CMS Form 1500 to Medicare, the claim is paid directly to the provider without any review of supporting documentation, including medical records. All Medicare providers must have and keep for seven years after the service date, in each of their patients' files, the medical documentation to establish that the Medicare items or services for which they have sought Medicare reimbursement are reasonable and medically necessary.  42 U.S.C. § 1395y(a)(1)(a); 42 U.S.C. § 1395g(a); 42 C.F.R. § 424.516(f).

_____

[1] Durable medical equipment is billed under the Healthcare Common procedure Coding System ("HCPCS"), which is divided into level I and level II HCPCS categories.  HCPCS Level I consists of Current Procedural Terminology ("CPT") codes maintained by the American Medical Association, which identify medical services and procedures provided by physicians and other health care professionals. HCPCS Level II consists of codes that "identify products, supplies, and services not included in the CPT-4 codes, such as ambulance services and durable medical equipment, prosthetics, orthotics, and supplies (DMEPOS) when used outside a physician's office."

## DEFENDANTS' FRADULENT SCHEME

50.     From on or about January 1, 2011 to present, defendants engaged in a scheme to: 1) pay illegal commissions to 1099 independent contractor sales representatives in violation of the Anti-Kickback Statute (AKS); 2) submit claims for Durable Medical Equipment (DME) devices supported by copied, stamped, and/or digitally forged physician signatures in violation of Medicare requirements; 3) submit claims for free and no cost items in violation of Medicare requirements; 4) routinely waive patient co-insurance in order to induce referrals; and 3) submit claims for DME devices not provided and/or not medically necessary.

A.     **Scheme to pay illegal commissions to 1099 independent contractor sales representatives in violation of the Anti-Kickback Statute (AKS) and the False Claim Act (FCA)**

   *1)  Legal Background & Safe Harbor Provisions*

51.     Payment of remuneration of any kind violates the Anti-Kickback Statute (AKS) if one of the purposes of the payment is to induce or reward referrals, which may be paid in whole or in part by government funded insurance programs. *United States v. Kats*, 871 F.2d 105, 108 & fn.1 (9th Cir. 1989) (citing agreement with *United States v. Gerber*, 760 F.2d 68, 72 (3rd Cir. 1985). Although the AKS applies broadly to payments or receipt of any remuneration to induce referral, it also contains specific "safe harbor" exceptions to liability.

52.     Under 42 U.S.C. § 1320a-7d, the Secretary and OIG have been tasked with promulgating the specific "safe harbor" exceptions to the AKS. In 1991, HHS published a final rule setting forth safe harbors in 10 broad areas: (1) investment interests, (2) space rental, (3) equipment rental, (4) personal services and management contracts, (5) sales practices, (6) referral services, (7) warranties, (8) discounts, (9) employees, and (10) group purchasing organizations. Medicare and State Health Care Programs: Fraud and Abuse; OIG Anti-Kickback, Final Rule, 56 Fed. Reg. 35952 (July 29, 1991) (to be codified as 42 C.F.R. § 1001.952). The following additional safe harbors were subsequently added: waivers of coinsurance and deductibles, managed care amounts, managed care price reductions, investment interests in underserved areas, investment interests in ambulatory surgical centers, investment interests in group practices, rural practitioner recruitment incentives, obstetrical malpractice insurance

subsidies, referral arrangements for specialty services, cooperative hospital service organizations, ambulance replenishment arrangements, federally qualified health centers, electronic records support and software.  42 C.F.R. § 1001.952.

53.   The employee safe harbor to the AKS expressly exempts employment relationships.  42 U.S.C. § 1320a-7b(b)(3). The employee safe harbor provides the following:

> Employees. As used in section 1128B of the Act [42 USC § 1320a-7b(b)], "remuneration" does not include any amount paid by an employer to an employee, who has a bona fide employment relationship with the employer, for employment in the furnishing of any item or service for which payment may be made in whole or in part under Medicare, Medicaid or other Federal health care programs. For purposes of paragraph (i) of this section, the term employee has the same meaning as it does for purposes of 26 U.S.C. 3121(d)(2).

42 C.F.R. § 1001.952(i).

54.   The personal services and management contracts safe harbor states that:
> (d) Personal services and management contracts. As used in section 1128B of the Act [42 USC § 1320a-7b(b)], "remuneration" does not include any payment made by a principal to an agent as compensation for the services of the agent, as long as all of the following seven standards are met—

> 1. The agency agreement is set out in writing and signed by the parties.
> 2. The agency agreement covers all of the services the agent provides to the principal for the term of the agreement and specifies the services to be provided by the agent.
> 3. If the agency agreement is intended to provide for the services of the agent on a periodic, sporadic or part-time basis, rather than on a full-time basis for the term of the agreement, the agreement specifies exactly the schedule of such intervals, their precise length, and the exact charge for such intervals.
> 4. The term of the agreement is for not less than one year.
> 5. The aggregate compensation paid to the agent over the term of the agreement is set in advance, is consistent with fair market value in arms-length transactions and is not determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties for which payment may be made in whole or in part under Medicare, Medicaid or other Federal health care programs.
> 6. The services performed under the agreement do not involve the counselling or promotion of a business arrangement or other activity that violates any State or Federal law.
> 7. The aggregate services contracted for do not exceed those which are reasonably necessary to accomplish the commercially reasonable business purpose of the services.

> For purposes of paragraph (d) of this section, an agent of a principal is any person, other than a bona fide employee of the principal, who has an agreement to perform services for, or on behalf of, the principal.

42 C.F.R. § 1001.952(d).

55.    In adopting the safe harbor regulations, HHS specifically declined to adopt an approach that would "broaden the [employee] exemption to apply to independent contractors paid on a commission basis." 54 Fed. Reg. at 3093.  In doing so, HHS explained that abusive and problematic practices specifically include situations where the "nature of the agreement is such that payments are intended to induce referrals, or there is an implicit or explicit arrangement where the amount of payment varies with the volume of referral." HHS explained that "[w]e have declined to adopt this approach because we are aware of many examples of abusive practices by sales personnel who are paid as independent contractors and who are not under appropriate supervision." HHS was clear that "[w]e believe that if individuals and entities desire to pay a salesperson on the basis of the amount of business they generate, then to exempt them from civil or criminal prosecution, they should make these salespersons employees where they can and should exert appropriate supervision for the individual's acts." *Id.*

### 2)  Defendants' Fraudulent Conduct

56.    From on or about January 1, 2011 through at least October 1, 2014, while certifying compliance with the AKS, defendants submitted and/or caused submission of false claims tainted by illegal commissions paid to 1099 independent contractor sales representatives in violation of the AKS and the FCA.

57.    Shortly after defendant Perkins formed PMP on or about June 2010, relator Van der Boom began working for defendant Perkins at PMP as a sales representative selling Durable Medical Equipment (DME) in the greater Sacramento area.

58.    Prior to working at PMP, relator Van der Boom did not have any health care or DME sales experience. Relator Van der Boom was taught, managed, and supervised by defendant Perkins, who was working as a DME sales agent for DonJoy Orthopedics at that time.

59.    During the entire time that relator Van der Boom worked for PMP, defendant Perkins paid Van der Boom as an independent contractor on a 1099 basis.  Van der Boom was

paid based upon a percent commission per DME order that he obtained and PMP billed. At first, from on or about January 2011 through January 2013, Perkins paid Van der Boom commissions based upon a projected value of the reimbursement due by Medicare, MediCal, or Tricare to PMP.  From on or about January 2013 to June 2014, Perkins paid Van der Boom commissions based upon the actual amount Medicare, MediCal, or Tricare paid for the claim.

60.     From on or about January 2011 through June 2014, PMP defendants paid Van der Boom approximately 20-28% commission on approximately 360 DME claims that PMP billed to Medicare, MediCal, and Tricare.

61.     At no time did relator Van der Boom have a written agreement outlining the scope and nature of his employment and/or pay at PMP.

62.     On or about spring of 2012, defendant Perkins promoted relator Van der Boom to an orthopedic sales manager position. After his promotion, Van der Boom continued selling DME and managed other PMP sales representatives. In return, Van der Boom was paid a percentage of his supervisee's commissions as a "management fee."

63.     Similar to Van der Boom, the majority of the sales representatives employed by PMP did not have prior DME or health care sales experience.

64.     Nearly all sales representatives at PMP were commission based 1099 independent contractors. PMP had commissioned independent contractor sales representatives in several geographic areas nationwide including the following locations:

Bay Area

Sales Representative Manager: Anthony Bradley

Sales Representatives: Nicholas Loredo, Steven White, Jeremy Hopkis, Darren King

Greater Sacramento

Sales Representative Manager: Kevin Hawes

Sales Representatives: John Houston, Brandon Nelson, Veronica Hern

Southern California

Sales Representative Manager: Hunter Hartman, Amy Lindhorst

Sales Representatives: Max Willick, John Mitchell, Ben Nelson

<u>Utah, Salt Lake City</u>

Sales Representative Manager: Morgan Horne

Sales Representatives: Tony Chang, Jay Knolly

PMP also has sales representatives in <u>Texas, New York, and Michigan</u>.

65.   Every month defendant Reynolds would email relator Van der Boom an excel spreadsheet tracking Van der Boom's orders and commissions. Defendant Perkins was usually copied on this email.

66.   The spreadsheet document emailed to relator Van der Boom each month by defendants Reynolds and/or Perkins had Van der Boom's DME claims labeled as being covered by Medicare, Tricare, and/or MediCal.

67.   The excel spreadsheet shows that PMP defendants paid relator Van der Boom commissions on approximately 360 claims that PMP submitted to Medicare, MediCal, and Tricare from January 2011 through June 2014.

68.   The commissions PMP paid relator Van der Boom and its independent contractor 1099 sales representatives violated the AKS, because they were intended to induce and/or reward the referral of patient orders to PMP, which were paid in whole or in part by government funded insurance programs. *See United States v. Kats*, 871 F.2d 105, 108 & fn.1 (9th Cir. 1989).

69.   Defendants knowingly paid commissions that were intended to induce and/or reward the referral of patients that may be covered by government funded insurance programs. The excel spreadsheet utilized by defendants Reynolds and Perkins shows that they were tracking Medicare, MediCal, and Tricare orders each and every month starting from January 2011 through July 2014.

70.   PMP's commission pay arrangement violates the AKS and is not protected by any safe harbor provision, including a personal and management services safe harbor and/or employee safe harbor.

71.   Despite being non-compliant, defendants expressly certified their compliance with the AKS via CMS enrollment Form 855S and with each submission of the CMS claim Form 1500 (or its electronic equivalent).

72.     Defendants' compliance with the AKS was material to obtaining payment and Medicare would not pay for orders that violated the AKS. CMS Form 855S specifically required a certification that the supplier "understand[s] that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark Law)…" A provider presenting a CMS Form 1500 certifies that the information provided is "true, accurate, and complete," and that "any false claims, statements, or documents, or concealment of material fact, may be prosecuted under applicable Federal and State laws." The 2012 CMS Form 1500 further certifies that "2) I have familiarized myself with all applicable laws, regulations, and program instructions, which are available from the Medicare contractor; … 4) this claim, whether submitted by me or on my behalf by my designated billing company, complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment including but not limited to the Federal anti-kickback statute and Physician Self-Referral law (commonly known as Stark law)…"

73.     As early as 1991, HHS has explicitly stated that abusive and problematic practices include situations like PMP's 1099 sales representatives commission payment arrangement - where the "nature of the agreement is such that payments are intended to induce referrals, or there is an implicit or explicit arrangement where the amount of payment varies with the volume of referral." 54 Fed. Reg. at 3093.

74.     The concern with PMP's arrangement is the incentive it provides to independent sales representatives to refer more services in order to increase their commissions, which can result in overutilization, abusive practices, and lack of supervision.

75.     As far back as 1991, HHS has specifically stated that "if individuals and entities desire to pay a salesperson on the basis of the amount of business they generate, then to exempt them from civil or criminal prosecution, they should make these salespersons employees where they can and should exert appropriate supervision for the individual's acts." *Id.*

76.     Although Congress enacted the prohibition against payment of kickbacks in any form regardless of whether a particular kickback gives rise to overutilization or results in poor-

quality care, as discussed below, PMP's illegal payment arrangement led to overutilization, falsification of records, overbilling, and billing for non-covered, free, and poor quality items.

**B.   Scheme to submit claims supported by prescriptions and/or certificates of medical necessity with copied, stamped, or digitally forged physician signatures in violation of Medicare requirements.**

   1) *Medicare Documentation Requirements*

77.    Under 42 U.S.C. § 1395l(e), "[n]o payment shall be made to any provider of services or other person under this part unless there has been furnished such information as may be necessary in order to determine the amounts due such provider or other person under this part for the period with respect to which the amounts are being paid or for any prior period." 42 C.F.R. § 424.57(c)(28) states that the supplier "[i]s required to maintain ordering and referring documentation consistent with the provisions found in § 424.516(f)."

42 C.F.R. § 424.516(f) requires that:

> (1)(i) A provider or a supplier that furnishes covered ordered items of DMEPOS, clinical laboratory, imaging services, or covered ordered/certified home health services is required to-
>
> (A) Maintain documentation (as described in paragraph (f)(1)(ii) of this section) for 7 years from the date of service; and
>
> (B) Upon the request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(1)(ii) of this section).
>
> (ii) The documentation includes written and electronic documents (including the NPI of the physician who ordered/certified the home health services and the NPI of the physician or, when permitted, other eligible professional who ordered items of DMEPOS or clinical laboratory or imaging services) relating to written orders and certifications and requests for payments for items of DMEPOS and clinical laboratory, imaging, and home health services.

42 C.F.R. §§ 424.516(f)(1)(i) &(ii).

78.    Compliance with Medicare's DME documentation standards is material to payment by Medicare. 42 C.F.R. § 424.57(c); CMS Form 855S and Form 1500.

79.    As early as 2006, CMS has stated that:

> If a supplier does not have a faxed, photocopied, electronic or pen and ink signed order in their records before they submit a claim to Medicare (i.e., if there is no order or only a verbal order), the claim will be denied… if the supplier does not have an order that has been both signed and dated by the treating physician before billing the Medicare program, the item will be denied as not reasonable and necessary.

Medicare Program Integrity Manual, 5.2.3 (Rev. 167, Issued: 10-27-06; Effective: 10-01-06; Implementation:10-02-06).

80.     In order to be paid by Medicare, before submitting a claim to Nordian, PMP was required to have the following records on file: (1) A verbal/dispensing/preliminary order (if applicable); (2) Detailed Written Order or prescription (DWO), (3) Certificate of Medical Necessity (CMN) (if applicable), (4) DME Information Form (DIF) (if applicable); (5) Proof of delivery; (6) Beneficiary authorization, (7) Advance Beneficiary Notice of Noncoverage (ABN) (if applicable), (8) Information from the treating physician concerning the patient's diagnosis, and any information required for the use of specific modifiers or attestation statements as defined in certain DME policies. Noridian's LCD for Oseteogenesis Stimulators (database number L11490), effective 8/1/2009 – 10/31/2013, available online at https://med.noridianmedicare.com/web/jddme/policies/lcd/archived-retired/retired-icd-9-lcds-and-articles/osteogenesis-stimulators.

81.     Medicare rules specifically require prescriptions (Detailed Written Orders or DWOs) and Certificates of Medical Necessity (CMNs) (if applicable) to be hand signed by the physician, and prohibit any stamped or otherwise copied signatures.

82.     CMS has specifically explained that "Medicare requires that services provided/ordered be authenticated by the author. The method used shall be a hand written or an electronic signature. Stamp signatures are not acceptable." Medicare Program Integrity Manual, 3.4.1.1 (Rev. 327; Issued: 03-16-10; Effective Date: 03-01-01; Implementation Date: 04-16-10)

83.     A supplier manual is published by Noridian to DME suppliers such as PMP and available online at https://med.noridianmedicare.com/web/jddme/education/supplier-manual. Noridian's online supplier manual contains a subchapter on prescriptions (i.e. detailed written orders or DWOs), which specifically states:

> A detailed written order is required before billing... Someone other than the ordering physician may produce the DWO. However, the ordering physician must review the content and sign the document... **Signature and date stamps are not allowed**. Signatures must comply with the CMS signature requirements outlined in PIM 3.3.2.4.

84.     Additionally, as far back as 2009, Local Coverage Determinations (LCDs) available to suppliers like PMP online via Nordian, have clearly stated that in relation to prescriptions (i.e. detailed written orders or DWOs):

> Someone other than the ordering physician may produce the DWO. However, the ordering physician must review the content and sign and date the document…**Signature and date stamps are not allowed**. Signatures must comply with the CMS signature requirements outlined in PIM 3.3.2.4…The DWO must be available upon request.

*See* Nordian's LCD for Oseteogenesis Stimulators (database number L11490), effective 8/1/2009 – 10/31/2013, available online at https://med.noridianmedicare.com/web/jddme/policies/lcd/archived-retired/retired-icd-9-lcds-and-articles/osteogenesis-stimulators.

85.     A Certificate of Medical Necessity (CMN) is a document that certifies medical necessity and applies to particular DME items.  Under Medicare rules, a CMN is required before billing, and it must be signed by a treating physician. As far back as 2009, LCDs available online via Nordian to suppliers like PMP, have explained that under Medicare's requirements CMNs must be "completed, signed, and dated by the treating physician, must be kept on file by the supplier and made available upon request." Nordian's LCD for Oseteogenesis Stimulators (database number L11490), effective 8/1/2009 – 10/31/2013, available online at https://med.noridianmedicare.com/web/jddme/policies/lcd/archived-retired/retired-icd-9-lcds-and-articles/osteogenesis-stimulators.

### 2)   Defendants' fraudulent conduct

86.     Beginning on or about August of 2010 to present, defendants knowingly submitted claims to Medicare and Tricare supported by prescriptions (Detailed Written Orders or DWOs) and Certificates of Medical Necessity (CMNs) that contained stamped, photocopied, and digitally forged physician signatures.

87.     On or about the fall of 2012 through January 2014, relators Roland and Burns observed in their assistance of PMP's billing that many physicians' signatures appeared to be stamped, photocopied, or otherwise forged, on PMP's prescriptions (DWOs) and Certificates of

Medical Necessity (CMNs). Moreover, the required Proof of Delivery (POD) forms did not meet Medicare criteria as they were either blank, missing identifying information of the item, or the dates when the DME were distributed was prior to medical necessity being established via the DWO. Further, if no CMN was required for a DWO a modifier of CG (spinal DME) or KX (knee DME) indicating medical necessity was added, even if the physician's chart documentation for the beneficiary did not establish medical necessity. Relators Roland, Burns and other staff members of EPMB, made numerous suggestions to defendants PMP, Perkins, and Reynolds. Despite Relators Roland, Burns and other EPMB staff member suggestions, PMP did not rectify these practices. Instead, when such deficiencies were found, PMP staff would immediately send a new version of such a deficient document to EPMB for submission.

88.     Beginning on or about August 2010 through October 1, 2014, relator Van der Boom observed defendant Perkins direct PMP sales representatives and administrative staff to forge medical doctors' signatures on prescription orders and certificates of medical necessity. Perkins and PMP staff forged signatures using two different methods, which Perkins coined as the "magic time" and "ninja drive" methods.

89.     The "magic time" method consisted of PMP staff, including but not limited to, Jeremy Perkins, Ryan Simpson and Jenae Helmer picking up a document with an alleged ordering physician's actual signature. This document could be the actual prescription order (if one existed), or a previous prescription order. PMP staff took the document with the actual signature, placed it under a document that required the physician's signature, placed the documents atop of a light source (i.e. a window) and traced the physician's actual signature. Relator Van der Boom observed this method numerous times throughout his employment when he walked by Perkins' office and confirmed said practice with PMP employee, Rebecca Hendricks. PMP staff sent these prescription orders and/or CMNs with these traced signatures to EPMB for Medicare billing.

90.     The "ninja drive" method consisted of Perkins using a USB portable computer device that was shaped like a toy ninja. The "ninja drive" contained blank CMNs with pre-printed signatures from ordering/prescribing physicians on the signature line. Relator Van der

Boom observed this method when he saw the "ninja drive" on Perkins' desktop computer. PMP staff used these pre-printed CMNs to submit via facsimile or electronically to PMP to bill Medicare or TRICARE. Initially, this practice only occurred when Perkins printed these pre-printed CMNs, however, this practice became routine beginning on or about the fall of 2012.

91.     Creation of such fraudulent documentation was common practice in PMP's Roseville office and its other locations nationwide.

92.     For example, relator Van der Boom is informed and believes that PMP's Bay Area office used pre-signed copies of blank prescription orders that were stored in a drawer. PMP Bay Area sales representatives, including Anthony Bradley, would fill out the pre-signed copied prescription orders and bill Medicare based upon these forged orders.

93.     Another example is a practice called "chiseling" used by PMP sales representative Hunter Hartman. Hartman was a commissioned sales representative who worked for PMP covering the Southern California territory.  Hartman also worked for other DME supply companies, including Orbit Medical. In 2013, Hartman was charged with felony health care fraud for "chiseling" or creating and forging of supporting documentation, including prescriptions, to meet Medicare's documentation requirements for power mobility devices for Orbit Medical. *See United States v. Hartman*, Case No. 2:13-cr-00663 (Dkt. No. 1) (D. Utah Sept. 27, 2013). Hartman's criminal matter involved his work as a sales representative for Orbit Medical, a DME company owned by Jacob Kilgore.  Kilgore also pled guilty to health care fraud in a related case of *United States v. Kilgore*, Case No. 2:13-cr-00711 (Dkt. No. 1) (D. Utah Sept. 27, 2013). In a sentencing memorandum filed in Kilgore's criminal matter, the United Sates noted that Kilgore's fraudulent scheme involved using quotas and "commissions to entice sales reps, to encourage them, and, sadly corrupt them," into "chiseling," many of whom were young, inexperienced, and working in a highly competitive field.  *United States v. Kilgore*, Case No. 2:13-cr-00711 (Dkt. No. 153).

94.     Likewise, Perkins and PMP defendants here also paid illegal commissions to 1099 sales representatives (many of whom were young and inexperienced in DME and health

care sales), in order to encourage them, entice them, and corrupt them into accepting and creating fraudulent documentation necessary to meet Medicare's coverage requirements.

**C.      Scheme to bill for free items in violation of Medicare requirements.**

95.     Reimbursement under the Medicare program to DME providers is subject to a fee schedule that sets the maximum amount payable for covered items in each area of Medicare's jurisdiction. 42 U.S.C. §1395m. Medicare pays the lower of the actual charge for the item or the maximum amount payable under the fee schedule. 42 U.S.C. §1395m(1)(B) (enacted as Social Security Act § 1862(a)(2)).

96.     With regard to no cost or free items, the Social Security Act specifically states that:

> Notwithstanding any other provision of this title, no payment may be made under part A or part B for any expenses incurred for items or services…for which the individual furnished such items or services has no legal obligation to pay, and which no other person (by reason of such individual's membership in a prepayment plan or otherwise) has a legal obligation to provide or pay for, except in the case of Federally qualified health center services.

42 U.S.C. §1395y(a)(2) (1976).

97.     As early as 2007, the Medicare Claims Processing Manual, Ch. 32, Section 67 titled "No Cost Items" has specifically stated that:

> On occasion, providers may receive an item (such as a device or drug) that is offered by a manufacturer/supplier free of charge. Such items, for purposes of these instructions, are considered "no cost items." Providers are not to seek reimbursement for no cost items as noted in Section 1862(a)(2) of the Social Security Act.

98.     Defendants violated Medicare's prohibition against billing for no cost or free items starting on or about November 1, 2011 through at least October 1, 2014, when they orchestrated a scheme to obtain free samples of Bone Growth Stimulators (BGSs) and fraudulently billed Medicare for these no cost samples in violation of Medicare requirements.

99.     On November 1, 2011, defendant Perkins sent an email to PMP sales representatives informing them that he would pay $500 for each BGS account a sales representative could sign up so that PMP could obtain free samples of BGSs from DonJoy Orthopedics. In his email, Perkins stated "We really need more BGS Samples. $500 per account that you sign-up!! -> account signs up for 6 sample units[.] See Rebecca for Ortho accounts, and

see me for any spine/pain clinics." This email related to a promotion by Don Joy Orthopedics whereby a physician can sign up for a promotional account and receive six (6) free sample units of Bone Growth Stimulators (BGSs). In his email, Perkins directed PMP's sales representatives to find doctors willing to sign up for this promotion, so that PMP could obtain free BGS samples.

100.   From November 1, 2011 through at least October 1, 2014, PMP was able to obtain numerous free BGSs through this promotion.  PMP defendants then supplied patients with the free BGSs and falsely billed government funded health plans including Medicare for these no cost promotional items in violation of Medicare's rules.

101.   The reason for this scheme is largely because Bone Growth Stimulator (BGS) reimbursement rate is significant. The Medicare fee-schedule reimbursement rate in California for spinal BGSs billed under the CPT code E0748-NU from on or about 2011 through 2014 was approximately $4,081.15 to $4,254.66 per single BGS unit.  From November 1, 2011 through at least October 1, 2014, PMP billed Medicare and Tricare for approximately 122 BGS through EPMB. Under the 80% payment rule, Medicare reimbursement rate to PMP for these BGSs from on or about 2011 through 2014 was approximately $3,302.62 to 3,343.28 per BGS unit.

102.   Defendants' claims for free sample BGSs were false because they did not disclose that they were obtained at no cost.  Defendants acted knowingly with deliberate ignorance of the truth or falsity of the information, and/or in reckless disregard of the truth or falsity of the information by submitting claims that violated Medicare's no cost item rules.

103.   The false records, statements, representations, and/or omissions were material to obtaining payment, and the government would not have paid the claims had it known of defendants' fraudulent representations, records, statements, and/or omissions.

**D.   Scheme to routinely waive patient co-insurance in order to induce referral of patients that may be covered by government funded health plans in violation of Medicare requirements.**

1) *Legal Background*

104.   Under Part B, Medicare generally pays 80% of the reasonable charges (as established by the Medicare Fee Schedule) for medically necessary services provided to

beneficiaries. 42 U.S.C. §§ 1395l(a)(1), 1395l(a)(1)(A).  Medicare beneficiaries are responsible for any deductible and the remaining 20% as co-insurance.  Some patients have a secondary insurance policy that may cover all or some of the patient's co-insurance and deductible.

105.    The co-insurance is intended to minimize costs to federal health care programs and beneficiaries by incentivizing beneficiaries to be better health care consumers – selecting services because they are medically needed, rather than simply because they are free.  *See* Department of Health and Human Services, Publication of OIG Special Fraud Alerts: Routine Waiver of Medicare Part B Copayments or Deductibles, 59 Fed. Reg. 65372, 65375 (December 19, 1994).  Consequently, federal law prohibits the routine waiver of co-payment or co-insurance, except in narrow circumstances.  *Id.* citing 18 U.S.C. §§ 287, 1001; 31 U.S.C. § 3729; 42 C.F.R. §§ 1320a-7, 1320a-7a, 1320a-7b).

106.    The HHS has stated that the routine waiver of co-insurance is prohibited because, first, "[a] provider, practitioner or supplier who routinely waives Medicare copayments … is misstating its actual charge."  For example, "if a supplier claims that its charge for a piece of equipment is $100, but routinely waives the co-payment, the actual charge is $80.  Medicare should be paying 80 percent (or $64), rather than 80 percent of $100 (or $80).  As a result of the supplier's misrepresentation, the Medicare is paying $16 more than it should for this item." *Id.* at 65374-75. As of 2003, the Medicare Claims Processing Manual (Ch. 23 § 80.8.1) explains that "[d]eductible and coinsurance amounts are taken into account (included) in determining the reasonable charge for a service or item."

107.    Second, the routine waiver of co-payments may constitute impermissible remuneration under provisions of the Social Security Act, including the Anti-Kickback Statute (AKS), 42 U.S.C. § 1320a-7b(b).  As the HHS Office of Inspector General explained:

> In certain cases, a provider, practitioner or supplier who routinely waives Medicare copayments … could be held liable under the Medicare and Medicaid anti-kickback statute. 42 U.S.C. § 1320a-7b(b). The statute makes it illegal to offer, pay, solicit, or receive anything of value as an inducement to generate business payable by Medicare or Medicaid.  When providers, practitioners or suppliers forgive financial obligations for reasons other than genuine financial hardship of the particular patient, they may be

unlawfully inducing that patient to purchase items or services from them.

*Id.* at 65375; *see also* Medicare Program Integrity Manual, Chapter 4 § 4.22.1.1 ("[r]outine waivers of co-insurance or deductible are unlawful because they could result in … violation of the anti-kickback statute.").

108.    Similarly, § 1128A(a)(5) of the Social Security Act prohibits the offer or transfer of remuneration to a Medicare beneficiary that the offeror or transferor knows or should know is likely to influence the beneficiary's health care decisions. 42 U.S.C. §1320a-7a(a)(5); *see also* OIG Special Advisory Bulletin, Offering Gifts and Other Inducements to Beneficiaries (Aug. 30, 2002).  Prohibited remuneration includes "the waiver of co-insurance and deductible amounts (or any part thereof)." 42 U.S.C. § 1320a-7a(i)(6).

109.    Even if non-routine, the waiver of a co-insurance is permissible only in narrow circumstances. The waiver must be (1) unadvertised, and must either (2) "address the special financial needs of a particular patient" or (3) occur after "a good faith effort to collect" has been exhausted.  Special Fraud Alert, 59 Fed. Reg. 65372, at 65375; see also 42 U.S.C. § 1320a-7a(i)(6) (prohibited remuneration does not include "the waiver of coinsurance" if (i) "the waiver is not offered as part of any advertisement or solicitation," (ii) "the person does not routinely waive coinsurance, and (iii) the person determined "in good faith that the individual is in financial need" or failed to collect "after making reasonable collection efforts"); 42 C.F.R. § 1003.101 (same).

110.    Co-payment waivers are not permissible if they are advertised. *Id.* Advertising includes indirect marketing or promotional efforts, or informal channels of information dissemination, such as word of mouth promotion by practitioners or patient groups.   OIG Special Advisory Bulletin, Offering Gifts or Other Inducements to Beneficiaries (Aug. 30, 2002). Suspect promotional efforts include statements like "Medicare Accepted As Payment in Full," "Insurance Accepted As Payment In full," or "No Out-Of-Pocket Expense." Special Fraud Alert, 59 Fed. Reg. 65372, at 65375.

    2)  *Defendants' fraudulent conduct*

111.    From on or about October 2011 to present, defendants routinely and purposefully waived Medicare patient co-payments in order to induce doctors to continue sending patients to them, and to assure that patients had no financial incentive to question the necessity of their excessive orders.

112.    Defendants failed to satisfy the conditions established by Medicare laws, regulations, and program instructions to support the waivers.

113.    Defendants regularly told their referring doctors that patients would not have to pay for defendants' services, and requested that relator Roland and EPMB routinely waive patient co-insurance and deductibles for Medicare orders. For example, on January 12, 2012, defendant Reynolds emailed an EPMB employee and copied relator Roland stating that "[t]his [order] is a Dr. Bindle case (as all of his), that we would ideally like the coinsurance waived. See Darleen."

114.    Relator Roland expressed her discomfort with routinely waiving patient co-insurance, and discussed this issue with defendants Perkins and Reynolds on several occasions thereafter. During these conversations, relator Roland informed defendants Perkins and Reynolds that routine waiver of co-insurance is not allowed under Medicare. Defendant Perkins responded to relator Roland stating that PMP's referring doctors were expecting that patients would not be billed for their 20% co-insurance, and that PMP did not want their patients billed for their co-insurance.

115.    At first, relator Roland agreed to not bill PMP's Medicare patients for co-insurance and to only bill Medicare patients for their deductible. Relator Roland requested that PMP develop a standard procedure regarding the billing of co-insurance, and informed defendants Perkins and Reynolds that waiver of co-insurance requires a good faith effort to collect, and that financial waiver procedures should be employed.

116.    In accordance with Perkins' and Reynolds' instructions, on May 8, 2012, relator Roland emailed EPMB employees and copied defendant Reynolds clarifying to her staff that PMP has instructed EPMB not to bill patients for their co-insurance balance but to bill the patients for their deductible. On October 5, 2012, relator Roland emailed defendant Reynolds

with her understanding that "[w]e [EPMB] are not balance billing patients for co-insurance. We are billing patients for deductibles and for information requests." Relator Roland instructed her staff at EPMB to continue to issue billing statements for PMP's patients, but not mail them off to patients per Perkins' and Reynolds' instruction.

117.   On April 4, 2013, relator Roland emailed defendant Reynolds and inquired about PMP providing written guidelines regarding the billing of co-insurance and deductibles. Defendants did not provide any written guidelines and continued to request that relator Roland and EPMB not send their Medicare patients any co-insurance billing statements.  Defendant Perkins and Reynolds informed relator Roland that this was especially important for patients who received Bone Growth Stimulators (BGSs) as the patient 20% co-insurance for these devices was approximately $700-800 per BGS.

118.   Relator Roland was unsuccessful at getting PMP to adopt financial waiver procedures and eventually instructed her employees to begin mailing billing statements to PMP's patients for their co-insurance on or about December 2013.  However, relator Roland continued to not send billing statements to PMP's patients for their co-insurance amount for BGS devices.  A confirming note sent by Jenae Helmer (a PMP employee) on February 5, 2014 informed an EPMB employee that "PT'S WHO RECV A BGS ARE NOT TO BE BAL BILLED."

119.   Out of approximately 112 BGS orders EPMB submitted to Medicare and Tricare for PMP from on or about 2011 through 2014, only approximately 2 patients were billed by EPMB and had paid their co-insurance amount.  For the remaining approximately 110 BGS orders, EPMB waived patient co-insurance per PMP's instructions as outlined above.

120.   PMP did not have documentation supporting financial hardship for its Medicare patients where EPMB was instructed to waive the co-insurance amount. Defendants routinely and indiscriminately promised free devices to referring doctors and patients without first making the required good faith effort to determine special financial need of the individual patient affected. Defendants then instructed EPMB to not bill their patients for co-insurance,

and engaged in no effort to collect the co-insurance amount. Defendants knew that if they gave EPMB no instructions, EPMB would eventually write off the balance as a "courtesy discount."

121.    In such manner, defendants submitted or caused the submission of a number of claims to Medicare that were false because (a) they were tainted by the knowing and willful offer/and or provision of kickbacks in the form of unjustified co-insurance waivers, and (b) they misrepresented the actual cost of defendant's services.

122.    Defendants knew, deliberately ignored, and/or were recklessly indifferent that the certifications and claims they submitted to Medicare and Tricare were false.  The false records, statements, representations, and/or omissions were material to obtaining payment, and the government would not have paid the claims had it known of defendants' fraudulent representations, records, statements, and/or omissions.

   **E.    Scheme to bill for DME items not provided and/or not medically necessary in violation of Medicare requirements.**

123.    On or about August 2010, relator Van der Boom observed PMP management, Perkins and Reynolds, purchase an item called Corflex Cryo Pneumatic Knee Orthosis with Range of Motion (hereinafter, "ROM") Hinge, and correctly billed this item under HCPCS L1832. As a sales representative, Van der Boom routinely heard ordering physicians order this item, but then removed the ROM hinge. As a result, PMP removed the ROM and retained them in PMP's Office. Beginning April 2012, Perkins and Reynolds decided to purchase the Corflex Cryo Pneumatic Knee Splint, which was similar to the Cryo Pneumatic Knee Orthosis, but had no ROM and was thus cheaper. This knee splint could properly be billed at HCPCS L1810 or HCPCS L1820. Instead, Perkins and Reynolds directed PMP staff to add the previously collected ROM hinges from knee orthoses and attach those to the knee splint, but bill the knee splint with the newly attached ROM as HCPCS L1832.

124.    On or about April 5, 2012, Reynolds sent an e-mail to PMP sales representatives regarding the "Corflex Cryo pneumatic knee brace." Reynolds stated, "Most of you have all heard of the new product by now (and will be receiving samples) that should turn around our Medicare options when it comes to cold therapy. When your Physicians are prescribing this

Knee brace, the emphasis on the prescription is for the knee brace, not the cold therapy, this is what meets the L1832 code and reimbursement and what makes the $. So when submitting these orders, there should be no hybrid requests on the RX such as "cold therapy brace" or "Corflex Cold therapy". Keep it simple – use Post-op knee brace L1832. See attached RX as an example, this will alleviate any confusion when billing to Medicare and eliminate denials."

125.     A knee orthosis HCPCS L1832 which bills at approximately $786.00, was billed for but not supplied to the Medicare patient. Instead, a knee splint under code L1810/L1820, billed for $120.00 was provided as if it were the L1832. Relator Van der Boom recalls following Perkins and Reynolds' directive once, but ceased doing so. However, Relator Van der Boom continued to observe all other PMP sales representatives continuing to bill in this manner.

126.     Relators Roland and Burns observed this practice when they received notification of Patient PMP12099. On April 26, 2013, EPMB received an e-mail from PMP employee Ross Mather to submit an authorization for PMP sales representative, Nick Loredo, for a Corflex Post Op Knee (HCPCS L1832) for Patient PMP12099. EPMB employee Marissa Gallwitz updated EPMB's electronic database stating that "THE PT GOT THEIR EOB'S AND CALLED PMP QUESTIONING WHY THE BRACE HE RECVD COULD EVER BE $786. PER PMP THE PT ACTUALLY RECVD AN L1810."

127.     On or about January 1, 2014, the Centers for Medicare and Medicaid updated the HCPCS L1832 billing code in HCPCS L1832 and HCPCS L1833. HCPCS L1832 now refers to "knee orthosis, adjustable knee joints (unicentric or polycentric), positional orthosis, rigid support, prefabricated item that has been trimmed, bent, molded, assembled, or otherwise customized to fit a specific patient by an individual with expertise."  To properly bill for a L1832, the proper item needs to be furnished and the custom fitting requirements must be met.

128.     Items that fall under L1832, must be custom fitted, meaning that [t]hey all require fitting and adjustment (for example, the item must be trimmed, bent, molded [with or without heat], or otherwise modified by an individual with expertise in customizing the fit in order for it to be used by a specific patient). Custom fitted requires modification of the item in order to provide an individualized fit. Modifications must result in alterations in the item

beyond simple adjustments made by bending, trimming, and/or molding of the item, installation of add-on components or assembly of the item.

129.   Moreover, the individual customizing the fitting must have expertise in customization. An individual with custom fitting expertise must have specialized training "to provide custom fitting services for patients with a mechanical need for orthotics."  Individuals that meet this requirement include: "a physician, a treating practitioner (a physician assistant, nurse practitioner, or clinical nurse specialist), an occupational therapist, or physical therapist in compliance with all applicable Federal and State licensure and regulatory requirements."

130.   HCPCS L1833 refers to "knee orthosis, adjustable knee joints (unicentric or polycentric), position orthosis, rigid support, prefabricated, off-the shelf."   An "off-the-shelf" (hereinafter, "OTS") orthotic is defined as "prefabricated items which require minimal self-adjustment for appropriate use and do not require expertise in trimming, bending, molding, assembling, or customizing to fit the individual."   Minimal self-adjustment is defined as "an adjustment that the beneficiary, caretaker for the beneficiary, or supplier of the device can perform and does not require the services of a certified orthotist (that is, an individual certified by either the American Board for Certification in Orthotics and Prosthetics, Inc., or the Board for Orthotist/Prosthetist Certification) or an individual who has specialized training."  42 C.F.R. § 414.402.

131.   Upon CMS' publication of the new HCPCS L1832 and L1833, Relator Van der Boom advised Perkins and Reynolds on numerous occasions that at the very least L1833 was the proper billing code for what was being provided. Perkins responded to Van der Boom's concerns by stating that PMP's fitters were bending and molding the Corflex knee braces to meet the L1832 requirement. Based on CMS guidelines, PMP never had a board certified orthotist or any individual with specialized training to perform customization of knee braces after January 1, 2014 as required by HCPCS L1832.

132.   A knee orthosis HCPCS L1832 which bills at approximately $786.00, was billed for but not supplied to the Medicare patient. Instead, a knee splint under code L1810/L1820, billed for $120.00 was provided as if it were the L1832.

**F.      Fraudulent Billing of Pneumatic Compression Devices under TRICARE**

133.    TRICARE uses the reimbursement rates established by CMS for certain DMEPOS. HCPCS codes that begin with an "A, E, K, L or V." HCPCS E0652 refers to a "pneumatic compressor, segmental home model with calibrated gradient pressure." There is currently only a draft local coverage determination from Noridian, however, there is a national coverage determination for this HCPCS.

134.    CMS' national coverage determination provides that:

The only time that a segmented, calibrated gradient pneumatic compression device (HCPCs code E0652) would be covered is when the individual has unique characteristics that prevent them from receiving satisfactory pneumatic compression treatment using a nonsegmented device in conjunction with a segmented appliance or a segmented compression device without manual control of pressure in each chamber.

The only unique characteristic identified in the clinical literature that requires the use of an E0652 device is lymphedema extending onto the chest, trunk and/or abdomen. However it is also clear that some chest, trunk and/or abdominal edema will respond to other, more conservative approaches to treatment, including manual lymphatic drainage, exercise, dietary change, dieresis, correction where possible of anemia and/or hypoprotenemia, compression garments of the involved extremities and, where necessary, use of an E0650 or E0651 PCD of the involved extremity or extremities.

Therefore, an E0652 device and a chest or trunk sleeve (E0656, E0657) used with an appropriate extremity sleeve are covered only when either coverage criterion 1 or 2 described above is met and the lymphedema extends past the limits of a standard compression sleeve and has failed to improve with a period of at least four weeks of regular, daily home use of the E0650 or E0651 with careful, in-person fitting, overview and training by a technician skilled in and regularly, successfully using the appliances prescribed. The medical record must contain information describing the cause of the lymphedema as described above and a detailed description of the severity and extent of the trunk and/or chest area lymphedema, including measurements and drawings and the specific details of the fitting, overview, training and results of monitoring by the technician and/or therapist during this period.

135.    HCPCS E0673 refers to a "segmental gradient pressure pneumatic appliance, half leg" that is billed as part of a bundle when a non-segmented pneumatic compressor, HCPCS E0650, is billed. "Segmental gradient pressure pneumatic appliances (HCPCS E0671-E0673) are appliances/sleeves which are used with a non-segmented pneumatic compressor (HCPCS E0650) but which achieve a pressure gradient through the design of the tubing and/or air chambers." A

HCPCS E0673 never accompanies a billing for a segmented pneumatic compressors (HCPCS E0652).   Segmented pneumatic compressors, HCPCS E0652 are used with appliances/sleeves coded by HCPCS E0667-E0669.

136.    HCPCS E0676 refers to an "intermittent limb compression device (includes all accessories)."  According to Noridian, HCPCS E0676 is "[a] pneumatic compression device that provides intermittent limb compression for the purpose of prevention of venous thromboembolism (E0676) is a preventive service. Items that are used for a preventative service or function are excluded from coverage under the Medicare DME benefit."

137.    When billing for HCPCS E0676, HCPCS E0655-E0673 are not billed for, as HCPCS E0676 is considered a bundled billing which includes the "garments/sleeves" ordinarily billed separately under HCPCS E0655-E0673.

138.    Plaintiffs allege that Defendants billed for pneumatic compression devices that were not provided to Medicare and TRICARE to get non-billable claims reimbursed. Plaintiffs allege that PMP billed pneumatic compression devices under alternative billable DME codes, such as HCPCS E0652 and HCPCS E0673 instead of HCPCS E0676, which were actually provided. Plaintiffs allege that PMP billed pneumatic compression devices under alternative billable DME codes; HCPCS E0652 and HCPCS E0673 devices were physically provided instead of CPCS E0676 which should have been provided.

139.    Relator Roland observed PMP's billing practice in regards to Patient **PMP15248**, a TRICARE South beneficiary. Patient **PMP15248** was provided with a pneumatic compression device for August 10, 2013, which EPMB attempted to obtain authorization of HCPCS E0676 for Patient **PMP15248** from TRICARE. TRICARE rejected authorization for Patient **PMP15248**'s aforementioned TRICARE claim for a pneumatic compression device, HCPCS E0676. On October 15, 2013, Relator Roland learned that Patient **PMP15248** was billed for HCPCS E0652 and HCPCS E0673 by PMP's other billing company, Dynamic Healthcare Management, when she obtained an explanation of benefits for Patient **PMP15248** from TRICARE. Dynamic Healthcare Management submitted Patient **PMP15248**'s claim as a HCPCS E0652 and HCPCS E0673. HCPCS E0652's total charge was $3,750.00 with TRICARE

allowed charges of $567.29 and HCPCS E0673's total charge was $730.00 with TRICARE allowed charges of $0.00.

**G.      PMP's use of other billers besides EPMB**

140.      From on or about October 2011 through January 2014, relator Roland's EPMB, as PMP's biller, submitted approximately 3,000 DME claims on behalf of PMP to Medicare, and approximately 350 DME claims on behalf of PMP to Tricare. Based on EPMB's internal tracking system, PMP was reimbursed approximately $1,211,489.93 by Medicare, and approximately $203,027.35 by TRICARE for the claims EPMB submitted on behalf of PMP.

141.      These amounts do not include the amounts reimbursed to PMP by submissions from PMP's other billing companies, Dynamic Healthcare Management and Medequip. Additionally, defendants also billed government funded health plans including Medicare under an unknown NPI number prior to obtaining its own NPI number on or about September 30, 2011, using a New York based biller.

**H.      Retaliation against relator Gant Van der Boom**

142.      On or about 2012, relator Van der Boom was managing the University of California Davis Medical Center account for PMP. Van der Boom received correspondence from UC Davis Medical Center questioning the efficacy of the L1832 braces PMP was providing to patients that lacked proper hinges as required by the HCPT code. When relator Van der Boom spoke to defendant Perkins regarding the UC Davis letter and questioned Perkins about the billing of L1832s by PMP, Perkins told Van der Boom not to worry about it.

143.      On or about February of 2013, relator Van der Boom received correspondence from Summit Orthopedics questioning the L1832s that PMP was providing to patients, following a patient complaint.  Relator Van der Boom spoke to defendant Perkins about the letter and told Perkins that he did not feel confortable selling L1832s that Perkins wanted him to sell.

144.      On or about spring 2014, Van der Boom also questioned Perkins about using prescriptions containing stamped physician signatures to bill Medicare.  As a result of relator Van der Boom's questioning and activities, defendants retaliated against Van der Boom in various ways. The retaliation included, but was not limited to creation of a hostile work

environment, demotion, and termination of relator Van der Boom on October 1, 2014. As a first

sales representative working for Perkins when PMP started, Van der Boom was in line to become

PMP's Northern California / Sacramento Area sales manager.  However instead of Van der

Boom, Mark Bernardini was given that position and Van der Boom had to pay Bernardini a

portion of his commissions as a "referral fee."

## FIRST CAUSE OF ACTION

### (False Claims Act: Presentation of False Claims)

### (31 U.S.C. § 3729(a)(1)(A))

### (against all defendants)

145.    Relators reallege and incorporate by reference the allegations contained in

paragraphs 1-144 of this Complaint.

146.    Defendants knowingly presented, or caused to be presented, false or fraudulent

claims for payment or approval to the United States, including claims for reimbursement by

Medicare for services and DME provided in violation of Medicare rules and regulations.

147.    Said claims were presented with actual knowledge of their falsity, or with

deliberate ignorance or reckless disregard as to their falsity.

148.    The false statements were material to the United States' payment of the false

claims.

149.    By virtue of the false or fraudulent claims that defendants made or caused to be

made, the United States suffered damages and therefore is entitled to treble damages, plus civil

penalties of not less than $5,500 and $11,000 for each fraudulent claim submitted, to be

determined at trial.

## SECOND CAUSE OF ACTION

### (False Claims Act: Using False Statements or Records to Get False Claims Paid)

### (31 U.S.C. § 3729(a)(1)(B))

### (against all defendants)

150.    Relators reallege and incorporate by reference the allegations contained in

paragraphs 1-144 of this Complaint.

151.    Defendants knowingly made, used, and caused to be made or used, false records or statements to get false or fraudulent claims paid and approved by the United States.

152.    Said records or statements were made, used, and caused to be made or used, with actual knowledge of their falsity, or with deliberate ignorance or reckless disregard as to their falsity.

153.    The false records or statements were material to the United States' payment of the false claims.

154.    By virtue of the false or fraudulent claims that defendants made or caused to be made, the United States suffered damages and therefore is entitled to treble damages, plus civil penalties of not less than $5,500 and $11,000 for each fraudulent claim submitted, to be determined at trial.

## THIRD CAUSE OF ACTION

### (False Claims Act: Retention of Proceeds to Which Not Entitled)

### (31 U.S.C. § 3729(a)(1)(G))

### (against all defendants)

155.    Relators reallege and incorporate by reference the allegations contained in paragraphs 1-144 of this Complaint.

156.    Each defendant knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the United States, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the United States.

157.    As discussed herein, defendants received far more monies from the United States than they were entitled to receive. Each defendant knew that it had received more money than they were entitled to receive, and avoided their obligation to return the excess money to the United States.

158.    The conduct of each defendant violated 31 U.S.C. § 3729(a)(1)(G) and was a substantial factor in causing the United States to sustain damages in an amount according to proof.

## FOURTH CAUSE OF ACTION

### (False Claims Act: Retaliation)

### (31 U.S.C. § 3729(a)(1)(H))

### (against all defendants)

159.    Relators reallege and incorporate by reference the allegations contained in paragraphs 1-144 of this Complaint.

160.    Relator Gant Van der Boom's actions in advising PMP's management, Jeremy Perkins and Marc Reynolds regarding defendants' fraudulent DME billing practices constitute protected activities in furtherance of a qui tam action, as defined by 31 U.S.C. §3730(h).

161.    Defendants retaliated against relator Gant Van der Boom as a direct result of his protected activities. The retaliation included, but was not limited to creation of hostile work environment, demotion, and termination of relator Van der Boom on October 1, 2014.

162.    Defendants' fraudulent acts described herein constitute violations of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A)-(B). Relator Van der Boom's efforts to disclose and correct defendants' violations of the False Claims Act as described herein, were made in furtherance of protected activities under 31 U.S.C. § 3730(h).

163.    Defendants knew or should have known (as defined in 31 U.S.C. § 3729(b)(1)) that relator Van der Boom was engaging in such protected activities when he advised against defendants' fraudulent billing practices to PMP's management, including Perkins and Reynolds.

164.    The conduct of each defendant violated 31 U.S.C. § 3730(h) and Cal. Gov. Code § 12653, and was a substantial factor in causing relator Gant Van der Boom to sustain compensatory damages, including damages for emotional distress. Relator Van der Boom is entitled to two times the amount of back pay, interest on the back pay, litigation costs and reasonable attorney fees pursuant 31 U.S.C. § 3730(h)(2).

## FIFTH CAUSE OF ACTION

### (Wrongful Termination in violation of California Public Policy)

### (Cal. Lab. Code §1102.5)

### (against all defendants)

SECOND AMENDED COMPLAINT FOR MONEY DAMAGES AND CIVIL PENALTIES FOR VIOLATIONS
OF THE FALSE CLAIMS ACT AND DEMAND FOR JURY TRIAL - 38

165.    Relators reallege and incorporate by reference the allegations contained in paragraphs 1-144 of this Complaint.

166.    Violations of California Labor code section 1102.5 can support a common law cause of action for wrongful termination in violation of public policy. *Ferretti v. Pfizer Inc.*, 855 F. Supp. 2d 1017, 1025 (N.D. Cal. 2012). Pursuant to section 1102.5(c), "an employer may not retaliate against an employee for refusing to participate in an activity that would result in a violation of a state or federal statute, or a violation or noncompliance with a state or federal rule or regulation." CAL. LAB. CODE § 1102.5(c). To establish a *prima facie* case of retaliation under 1102.5(c), a plaintiff must show (1) he/she engaged in a protected activity, (2) thereafter, he/she was subjected to adverse employment action by his/her employer, and (3) there was a causal link between the protected activity and the adverse employment action. *See Ferretti*, 855 F. Supp at 1025.

167.    Relator Gant Van der Boom's actions in advising PMP's management regarding defendants' fraudulent billing practices to the Centers for Medicare and Medicaid and the Defense Health Agency constitute protected activities in furtherance of a qui tam action, as defined in 31 U.S.C. § 3730(h).

168.    Defendants retaliated against relator Gant Van der Boom as a direct result of his protected activities. The retaliation ultimately culminated in the termination of relator Gant Van der Boom's employment with PMP on October 1, 2014.

169.    Defendants' fraudulent acts described herein constitute violations of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A)-(B). Relator Gant Van der Boom's efforts to disclose and correct defendants' violations of the False Claims Act as described herein, were made in furtherance of protected activities under 31 U.S.C. § 3730(h).

170.    Defendants knew or should have known (as defined in 31 U.S.C. § 3729(b)(1) that relator Gant Van der Boom was engaging in such protected activities when he advised against Defendants' fraudulent billing practices to PMP management, including Perkins and Reynolds.

171.    The conduct of each Defendant alleged herein violated 31 U.S.C. § 3730(h), constituted wrongful termination in violation of public policy pursuant to CAL. LAB. CODE §1102.5, and was a substantial factor in causing relator Gant Van der Boom to sustain damages, including damages for emotional distress and punitive damages pursuant to CAL. CIV. CODE § 3294.

172.    The conduct of each defendant alleged herein demonstrates malice, oppression and/or fraud and warrants an award of punitive damages to plaintiff Gant Van der Boom. Plaintiff Gant Van der Boom suffered damages as a direct result of each defendant's intentional, fraudulent, oppressive and/or reckless acts and/or with conscious disregard of the rights of Relator Gant Van der Boom such as to be considered despicable as to constitute cruel and unusual oppressing, entitling plaintiff Gant Van der Boom to punitive damages in an amount according to proof at the time of trial.

173.    Malice is defined as "conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others." Cal. Civ. Code § 3294(c)(1). As alleged herein, the conduct of each defendant was malicious as defendants willfully and consciously disregarded Relator Gant Van der Boom right to report fraudulent wrongdoing.

174.    Oppression is defined as "despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights." Cal. Civ. Code § 3294(c)(2). As alleged herein, the conduct of each defendant was oppressive as their conduct was despicable and subjected Relator Gant Van der Boom to unjust hardship in conscious disregard to his right to report fraudulent wrongdoing.

175.    Fraud is defined as "an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury." Cal. Civ. Code § 3294(c)(3). As alleged herein, the conduct of each defendant was fraudulent, as each defendant intentionally misrepresented their compliance with relevant rules and regulations and terminated

Relator Gant Van der Boom when he advised against Defendants' wrongdoing, thereby causing Relator Gant Van der Boom substantial injury.

## SIXTH CAUSE OF ACTION

**(California False Claims Act for Presentation or Cause of Presentation of False Claims to MediCal)**

**(Cal. Gov. Code § 12651(a)(1))**

**(against all defendants)**

176.    Relators reallege and incorporate by reference the allegations contained in paragraphs 1-144 of this Complaint.

177.    Defendants, and each of them, knowingly (as defined in Cal. Gov. Code §12650(b)(2)) presented or caused to be presented false and fraudulent claims for payment or approval from California's MediCal system.

178.    Defendants either directly presented such false claims for payment to insurers, or caused such false claims to be presented.

179.    The conduct of defendants, and each of them, violated Cal. Gov. Code § 12651(a)(1) and was a substantial factor in causing California to sustain damages in an amount according to proof pursuant to Cal. Gov. Code section § 12651(a).

## SEVENTH CAUSE OF ACTION

**(California False Claims Act for Making, Using, or Causing to be Made or Used, a False Record or Statement Material to a False or Fraudulent Claim presented to MediCal)**

**(Cal. Gov. Code § 12651(a)(2))**

**(against all defendants)**

180.    Relators reallege and incorporate by reference the allegations contained in paragraphs 1-144 of this Complaint.

181.    Defendants, and each of them, knowingly (as defined in Cal. Gov. Code §12650(b)(2)) made, used, or caused to be made or used false records or statements to get false claims paid or approved by California's MediCal system.

182.     The conduct of defendants, and each of them, violated Cal. Gov. Code §

12651(a)(2) and was a substantial factor in causing California to sustain damages in an amount

according to proof pursuant to Cal. Gov. Code section § 12651(a).

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, relators hereby demand a trial by

jury.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs and relators respectfully request as follows:

1.      For judgment in favor of the United States of America against defendants, jointly

and severally, by reason of the violations of the False Claims Act as set forth above;

2.      Defendants cease and desist from violating the False Claims Act, 31 U.S.C.

§§3729, et seq.

3.      The assessment of treble damages against the defendants that the United States

has sustained because of defendants' actions;

4.      For a civil penalty of not less than five thousand five hundred dollars ($5,500.00),

and not more than eleven thousand dollars ($11,000.00), or as are authorized by law, for each

fraudulent claim submitted;

5.      Award to relators, as the qui tam plaintiffs, of the maximum amount allowed

pursuant to 31 U.S.C. §3730(d) of the Federal False Claims Act on the United States' recovery;

6.      Award to relators of all reasonable expenses, which the Court finds to have been

necessarily incurred, plus reasonable attorney's fees and costs of suit herein incurred;

7.      Punitive damages on all causes of action, to the extent allowable by law; and

8.      For such other and further relief as the court may deem proper.

Respectfully submitted,

Dated: 2/3/2017


/s/ Gary Callahan
Gary B. Callahan, SBN 47543
Attorney for Relator